J-A05003-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| BOHDAN CHAC, | |
| Appellant | No. 2830 EDA 2014 |

Appeal from the Judgment of Sentence of May 19, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008766-2012

BEFORE:  OLSON AND OTT, JJ. and STEVENS, P.J.E.*

MEMORANDUM BY OLSON, J.:                    **FILED APRIL 14, 2016**

Appellant, Bohdan Chac, appeals from the judgment of sentence entered on May 19, 2014, as made final by the denial of Appellant's post-sentence motion on September 29, 2014.  We affirm.

The able trial court has thoroughly summarized the evidence that was presented during Appellant's jury trial.  As the trial court explained:

> On May 6, 2012, at around 10:00 p.m., [Appellant] shot and killed Linda Raudenbush as she came down the stairs from the second floor of 3302 Fairdale Road in Philadelphia. [Appellant] shared this residence with Ms. Raudenbush, his common-law wife, and their [26-year-old] son, David Chac. In November 2011, [18-year-old] Sara Ayyash moved into this residence as [Appellant's] girlfriend against the wishes of her mother, Angela Garland.  Ms. Ayyash had been communicating with [Appellant] on Facebook since May 2010.  At that time, [Appellant] was around [55] years old and Ms. Ayyash was [16] years old.  Their relationship turned sexual in November 2010 when Ms. Ayyash began to electronically send [Appellant] pornographic photographs and videos.  [Appellant] was partially paralyzed and Ms.

*Former Justice specially assigned to the Superior Court.

Ayyash helped care for him during the period they lived together.

During the period she lived with [Appellant], Ms. Ayyash was permitted to visit her mother about three [or] four times. In fact, she had visited her mother the weekend before the murder. On May 6, 2012[,] Ms. Ayyash returned to [Appellant's] residence and found him and Ms. Raudenbush in the middle of an argument. At some point[,] Ms. Ayyash got involved in the argument and threw a book at [Appellant] after he insulted her. When Ms. Ayyash approached [Appellant], he pulled her hair. Ms. Raudenbush then approached [Appellant] and bit his foot. Shortly thereafter, Ms. Ayyash and Ms. Raudenbush retreated upstairs. Later, Ms. Raudenbush went back downstairs to continue the argument. When Ms. Raudenbush reached the bottom of the stairs, she leaned toward [Appellant] and yelled at him. In response, [Appellant] sat upright in his hospital bed, extended his right arm, pointed his gun at Ms. Raudenbush and shot her in the left chest. Ms. Raudenbush fell forward on the stairs.

On May 6, 2012, at about 10:22 p.m., Police Officer Robert Francisco responded to a radio call about a person screaming at 3302 Fairdale Road. Within minutes, Officer Francisco arrived on location and encountered Rowena Wolfe-Paupst, who had called 911 after observing Ms. Ayyash waiving a white rag from inside the second floor bedroom window of the residence. Officer Francisco exited the vehicle, looked up at the window and saw Ms. Ayyash screaming and waiving the white rag. He attempted to communicate with Ms. Ayyash while she was in the window, but he could not understand her responses. Given the apparent urgency, Officer Francisco opened the unlocked front door and went inside. He announced his presence as he walked into the hallway, but did not receive any response.

As Officer Francisco continued to walk down the hallway[,] he saw [Appellant] who was sitting upright in his hospital bed inside the living room, wearing a green Phillies T-shirt. Officer Francisco stated: "[t]here is a woman waving a rag upstairs at the window for help. What's going on here?" [Appellant] stated that he did not know what happened

- 2 -

because he had been asleep. Once inside the living room, Officer Francisco saw the deceased, Ms. Raudenbush, lying on the stairs with blood all over the front of her dress. Ms. Raudenbush's body was at the bottom of the stairs leading to the second floor, about five or six feet away from [Appellant's] bed. Her feet were touching the stairs, and her upper body was wedged between the wall and a second hospital bed which was covered with clutter. Officer Francisco immediately called rescue.

Officer Francisco then saw Ms. Ayyash standing at the top of the stairs and asked her to come downstairs to tell him what happened. She replied that the victim shot herself. Ms. Ayyash told Officer Francisco that she did not see Ms. Raudenbush shoot herself, but that she had heard the gunshots. Officer Francisco then asked Ms. Ayyash why she had not called [the] police, and she replied that she was too scared to call. Later, when Detective Gross responded to the scene and asked Ms. Ayyash if she had heard gunshots, she told him no. Officer Francisco then confronted Ms. Ayyash about this inconsistency, and she responded that she did hear gunshots. Immediately after Ms. Ayyash's reply, [Appellant] said: "[y]ou didn't hear a gunshot. I had the movie Scarface on and that's what you heard. You didn't hear any gunshot." Officer Francisco again asked [Appellant] if he had heard or seen anything and [Appellant] cavalierly responded: "[n]o, I don't know anything about it." [Appellant's] son was not home and Officer Francisco did not see anyone else inside the house. At trial, Detective Joseph McDermott, the assigned homicide investigator, stated that a video obtained from a Rite Aid store located at Academy Avenue and Byberry Road showed the son entering [the Rite Aid] at 9:53 p.m. and exiting at 10:02 or 10:06 p.m. Detective McDermott [testified] that David Chac then walked "quite a distance" to return home.

When the medics arrived to care for the victim, Officer Francisco observed a black gun, later identified as a CZ75 [nine-millimeter] semi-automatic black pistol, lying upside down on the second hospital bed on the room. Officer Francisco secured the gun while Ms. Raudenbush received medical attention. The gun was later submitted to the Firearms Identification Unit for examination. . . .

At 10:45 p.m., Linda Raudenbush was pronounced dead inside the residence. At trial, Dr. Marlon Osbourne testified as an expert in forensic pathology. After performing an autopsy on the victim's body, Dr. Osbourne concluded to a reasonable degree of medical certainty that the cause of death was one gunshot wound to the chest. The bullet perforated Ms. Raudenbush's left lung, heart, and aorta. The bullet entered her left chest cavity and fractured her fourth and fifth rib anteriorly. The bullet then lacerated the upper lobe of her left lung and traveled through the left ventricle of her heart. The bullet further lacerated her thoracic aorta and traveled into her eighth thoracic vertebra, where a fragment was retrieved. There was no exit wound on her body. Due to these injuries, Ms. Raudenbush was bleeding internally and she had one liter of clotted and liquid blood inside her left chest cavity.

After performing the autopsy, Dr. Osbourne further concluded to a reasonable degree of medical certainty that the manner of death was homicide, and not suicide or accident. Dr. Osbourne opined that the path of the bullet in the victim's body was consistent with testimony that the victim went to the bottom of the stairs and leaned over toward [Appellant] before she was shot. Dr. Osbourne also observed that the gunshot wound was an irregular ovoid shape and had no soot, stipple[,] or muzzle imprint around it. He explained that soot, a black stain, is present when the muzzle of a gun is within six inches to one foot from the victim's body. Stipple, an abrasion on the skin or hole in the clothing, is present when the muzzle of the gun is within two and one-half to three feet from the victim's body. A muzzle imprint is present once a gun has been pressed against the victim's skin. Because there was no soot, stipple[,] or muzzle imprint around Ms. Raudenbush's gunshot wound, Dr. Osbourne concluded that the muzzle of the gun was farther than two and one-half to three feet away from the victim because one or all three of these indicators would have been present had the victim committed suicide. For these reasons, Dr. Osbourne concluded that a suicide had not occurred in this case.

During the autopsy, Dr. Osbourne performed a toxicology test on Ms. Raudenbush and discovered 70 micrograms per deciliter of ethanol, less than 50 micrograms per liter of

codeine, and less than 30 micrograms per liter of alprazolam (Xanax). Dr. Osbourne found that the alcohol in the victim's body was less than the legal driving limit and that the levels of alprazolam and codeine were minimal. Consequently, Dr. Osbourne concluded to a reasonable degree of medical certainty that the drugs and alcohol found in Ms. Raudenbush's body did not contribute to her death.

On May 7, 2012, at about 7:00 a.m., Police Officer Terry Tull arrived at the crime scene and began to take photographs. When Officer Tull went inside the residence, he encountered a cluttered living room containing two hospital beds. [Appellant] was sitting on one hospital bed, about seven feet away from the foot of the stairs where the victim's body was located. The other hospital bed was covered with clutter. Ms. Raudenbush's body had been slightly repositioned by responding medics who had attempted to resuscitate the victim. The dining room was impassable because it was piled high with clutter. Officer Tull further observed two bullet holes in the first floor ceiling of the main hallway that led to the living room. Given the cluttered state of [Appellant's] house, Officer Tull used trajectory probes to determine the path the bullets traveled. Based on his training and experience, Officer Tull determined that the trajectory probes pointed toward [Appellant's] bed. As a result, Officer Tull concluded that the gun was fired from [Appellant's] bed.

A search warrant was obtained for the residence. However, both Ms. Ayyash and David Chac, who arrived at some point after the murder, were transported to Northeast Detectives to be interviewed before it was executed. [Appellant] was transported to Aria Torresdale Hospital due to his medical condition. Before [Appellant] was transported to the hospital, Detective John Hopkins retrieved the green Phillies T-shirt and the red shorts that [Appellant] had worn on the day of the murder. These items were bagged separately and submitted to the forensics laboratory for gunshot reside testing. After [Appellant] was transported to the hospital, Detective Hopkins recovered one blue comforter, two bed sheets, and one pillow from [Appellant's home] hospital bed. These items were bagged separately and submitted to the forensics laboratory for gunshot residue testing. He also recovered a black Action Arms pistol case for the CZ75

[nine-millimeter] pistol and one metal magazine containing a [nine-millimeter] round. Officer Tull then moved [Appellant's] bed and the surrounding clutter and began to search for projectiles. Officer Tull found three fired cartridge casings under the rear of [Appellant's] bed. Two of the fired cartridge casings were about one and one-half feet apart from each other. No other fired cartridge casings were recovered from the residence.

On May 7, 2012, at 11:54 a.m., Detective Tim Lynch interviewed [Appellant] while he was inside an emergency room treatment cubicle. Detective Hopkins and Sergeant Hendershot were also present. During this interview, [Appellant] appeared alert and answered the detective's questions. He did not appear to be under the influence of drugs. After the interview, Detective Lynch provided [Appellant] the opportunity to review the written statement. However, [Appellant] refused to sign the statement.[1] . . .

_____

[1] On May 7, 2014, the following questions were asked by Detective Lynch and answered by [Appellant]:

Detective Lynch: What happened last night in your home?

[Appellant]: Sara got home around 5:00 p.m. or 6:00 p.m. My wife tried to grab some of my pills. It was some of my Ambien and my Tylenol 4. I was getting a bath from my son at that time. She came to get the pills and I pushed her away with my right foot. She bit my foot. My son told her to go away. She went upstairs. She had hit me in the face with something. After she left I noticed that I had a bloody nose. I yelled up to her that I was going to act on a letter that I got from the 8th District. The letter said the police knew I was being abused. I also told her I was going to call the [D.A.] I took [two] Xanax [and] an Ambien. I tried to get YouTube on to put me to sleep. I just woke up a while later. I noticed a Scarface clip was playing and music playing. I was trying to go back to sleep. I got woken up by a police officer who was knocking and he came in. Before I fell asleep I sent my son to Rite Aid. I had [two] guns near me when I went to sleep. As far as I know neither had bullets in them. I took the bullets out.

*(Footnote Continued Next Page)*

Detective Lynch:  Which guns did you unload?

[Appellant]: Smith [and] Wesson Bodyguard .38 (snub nose, shroud hammer, nickel, brown wood handle) C[Z]75 []9mm (black auto).

Detective Lynch:  Did you unload the guns yourself?

[Appellant]: Around [two] weeks ago I pulled out the clip of the CZ75.  If I felt danger at night sometimes I put the clip back in.

Detective Lynch: Are you able to unload the gun and clear the chamber by yourself?

[Appellant]: I can unload it, but not clear the chamber.  My left hand doesn't work.

Detective Lynch: Was the CZ75 loaded last night?

[Appellant]: I thought it was unloaded.  It's possible I may have put the clip in [two] days ago.

Detective Lynch: When was the last time you saw Linda alive?

[Appellant]: When she went upstairs.

Detective Lynch: What time was that?

[Appellant]: Early evening.  I'm not sure.

Detective Lynch: Where did you put the CZ75 magazine when you remember taking it out?

[Appellant]: On the left of the bed.  Down in a drawer thing.

Detective Lynch: Where was the CZ75?

On May 14, 2012, at 11:50 a.m., Detective McDermott interviewed [Appellant] inside his residence.  Although [Appellant] was not under arrest, [] Detective McDermott read him his [*Miranda*[2]] rights.  [Appellant] indicated that he understood the warnings.  He also appeared coherent, alert, and able to understand English.  [Appellant] did not

*(Footnote Continued)* ——————————

[Appellant]: In a box on my right side on the bed next to me.

Detective Lynch: Was it within reach?

[Appellant]: Yes.

Detective Lynch: Did you hear any gunshots last night?

[Appellant]: Yes.  When I woke up I heard them on YouTube.  There were a lot of shots at the end of the movie.

Detective Lynch: How do you think Linda was shot?

[Appellant]: I have no idea.  I don't know if someone came in and tried to shoot her and maybe she got shot.

Detective Lynch: Did you fire your CZ75 last night?

[Appellant]: No.

Detective Lynch: When was the last time you did fire a gun?

[Appellant]: Years ago.

Detective Lynch: Is there anything else that you want to add?

[Appellant]: No.

[N.T. Trial, 5/14/14, at 146-150 (some internal brackets omitted); ***see also*** Commonwealth's Exhibit 27].

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

state at any point during this interview that he wished to invoke his right to a lawyer or right of silence. When the detectives first arrived at the residence, [Appellant] paid them no attention. Instead, [Appellant] used his computer until he was asked to focus on the interview. While [Appellant] used his computer, Detective McDermott observed that [Appellant] had full use of the right side of his body. He moved the computer mouse and wrote inside a notepad with his right hand and pulled himself upright with his right arm. [Appellant] also used his right hand when he pointed and told Detective McDermott where he kept his gun. During the interview, [Appellant] closed his eyes when he was asked about the murder. He also had no explanation for the bullet holes in the ceiling. Conversely, [Appellant] responded to questions pertaining to what occurred before and after the murder. Detective McDermott interviewed [Appellant] for about one hour. When Detective McDermott returned to his office, he memorialized this interview in a memorandum.[3] During the informal

_____

[3] Detective McDermott summarized [Appellant's] account of what happened before the incident:

> He had said that him and Linda were fighting all day, and that Linda and Sara went upstairs. And then he used to keep his CZ pistol next to him for protection. And then next thing he remembers was the police waking him up. He doesn't know – the police officer says there is a woman laying over here. This is what the police officer – I don't think that's in here – that the police officer woke him up and said something about a woman laying there, and he couldn't see over there.
>
> Then I said something about Sara saying something about him hollering up. That's when he closed his eyes. Then he was saying about the Scarface movie being on, and he doesn't remember how it got on, and that must have been the gunshots. Then I asked him about the bullet holes that were in the ceiling and he didn't know nothing about that.

[N.T. Trial, 5/15/14, at 119-120; *see also* Commonwealth's Exhibit 29].

interview, [Appellant] denied the detective's request to submit to a formal interview.

Ms. Ayyash provided five different statements to police concerning this incident. On May 7, 2012, at 3:00 p.m., Ms. Ayyash was interviewed by Detective Lynch at Northeast Detectives. In that statement, Ms. Ayyash asserted that she did not know what happened and that she did not hear anything. During that interview, the detectives confiscated Ms. Ayyash's gray short sleeve T-shirt, sweatpants, and underwear. These items were bagged separately and submitted for gunshot residue testing. On that same day, at 2:30 p.m., Ms. Ayyash was interviewed a second time by Detective Lynch. In that statement, Ms. Ayyash told Detective Lynch about the argument that occurred before the shooting. Ms. Ayyash also told Detective Lynch that she heard two "quick pops" after Ms. Raudenbush went down the stairs. Ms. Ayyash stated that she was at the top of the stairs when she heard this noise. Ms. Ayyash also stated that she asked [Appellant] "What did you do?" after observing the decedent half standing and half slumped at the base of the stairs. She told Detective Lynch that [Appellant] stated to her: "Shut the fuck up." In response, she told [Appellant] that she would not say anything and asked him why he did it. She then ran into a bedroom, shut the door and waved the white rag out of the second floor window for help.

At 6:55 p.m., Ms. Ayyash gave a third statement. During this interview, she provided details about her relationship with [Appellant] and identified [Appellant] from a photograph. On May 17, 2012, at 2:50 p.m., Ms. Ayyash gave a fourth statement to Detective McDermott, and Detective (now Sergeant) Vince Rodden. After being shown a photograph from the crime scene, Ms. Ayyash marked "X" where [Appellant] normally kept his semi-automatic gun and marked "G" where [Appellant's] gun was found after the shooting. On October 26, 2012, at 6:00 p.m., Ms. Ayyash gave a fifth statement to Detective McDermott. In that statement, Ms. Ayyash said that she saw sparks fly from the gun. On July 25, 2012[,] Ms. Ayyash testified at [Appellant's] preliminary hearing that she and Ms. Raudenbush drank alcohol after they retreated upstairs following the argument. At trial, Ms. Ayyash stated for the

first time that she saw [Appellant's] arm extended before hearing gunshots and seeing Ms. Raudenbush fall forward on the stairs. She also stated that [Appellant] threatened her when she was at the top of the stairs, telling her that she was next. Ms. Ayyash explained that she had received counseling after providing the detectives her statements and testifying at the preliminary hearing and that she now wanted to "tell the whole truth."

At trial, Police Officer Ronald Weitman testified as an expert in firearms and ballistics testing. He received the ballistics evidence and prepared a report after conducting an examination. The CZ75 semi-automatic [nine-millimeter] Luger gun contained 12 live [nine-millimeter] Luger cartridges inside even though it had the capacity to hold [17] cartridges. In addition to confirming the gun's operability, Officer Weitman found that it loudly fired bullets in close quarters. Officer Weitman also received the three [nine-millimeter] Luger fired cartridge casings expelled from the CZ75 gun when it was test-fired. He found that the fired cartridge casings were similar to each other. He also discovered that the fired cartridge casings ejected to the right and to the rear when the gun was fired. After analyzing this evidence, Officer Weitman concluded to a reasonable degree of scientific certainty that the three fired cartridge casings recovered from [Appellant's] residence were fired from the CZ75 semi-automatic gun.

Officer Weitman further concluded to a reasonable degree of scientific certainty that the ballistics evidence was consistent with testimony that [Appellant] extended his right hand, held the gun, and shot the victim. Officer Weitman based his conclusion on the trajectory probes that pointed toward [Appellant's] bed, the location of the three fired cartridge casings found behind [Appellant's] bed, and the way that the fired cartridge casings ejected from the gun. Officer Weitman further opined that the fired cartridge casings would have been found within the area of the body if the killing had been self-inflicted.

Officer Weitman also received the bullet jacket fragment and fragment pieces that the medical examiner retrieved from Ms. Raudenbush's body. Officer Weitman opined that a bullet can fragment when it penetrates two hard ribs.

Although the bullet jacket was torn, Officer Weitman was still able to determine that it was [nine-millimeter] because the base diameter was intact. After comparing the bullet jacket fragment to the recovered fired cartridge casings, Officer Weitman concluded that the bullet jacket had been fired from the same gun because they had the same projectile design. On June 13, 2012, Officer Tull manually examined the CZ75 gun and found no fingerprints. Although the gun was not submitted for DNA testing, [Appellant] admitted his ownership of the weapon to the police.

At trial, Gamal Emira testified as an expert in gunshot residue testing and forensic science. Mr. Emira reviewed the criminalistics report prepared by Francis Padayatty, who received and examined [Appellant's] green Phillies short sleeve T-shirt, one blue twin comforter, one light blue bed sheet, one yellow bed sheet, and one pillow. These items were stubbed and a scanning electron microscope was used to search for gunshot residue particles on the bedding and the clothing. A stub is aluminum, rounded and covered with double-sided carbon tape, which easily transfers any particle from a garment. The scanning electron microscope uses an electron beam and magnifies each particle up to 100,000 times. Mr. Emira explained that the presence of gunshot residue particles on a person's clothing indicated either that the person fired the gun, that the person was within six or seven feet of the fired gun, or that the person touched a surface covered with gunshot residue particles.

[Appellant's] T-shirt was stubbed four times. The first stub from the front right sleeve contained nine gunshot residue particles. The second stub from the back right sleeve contained [13] gunshot residue particles. The third stub from the front left sleeve contained eight gunshot residue particles. The fourth stub from the rear left sleeve contained eight gunshot residue particles. [Appellant's] shorts were not tested. The stub from [Appellant's] comforter contained one particle. The stub from [Appellant's] light blue bed sheet contained nine gunshot residue particles. The stub from [Appellant's] yellow bed sheet contained two gunshot residue particles. The stub from [Appellant's] pillow contained one particle. Ms. Ayyash's T-shirt was also examined and stubbed four times.

- 12 -

The first stub from the front right sleeve of the T-shirt contained four particles. The second stub from the rear right sleeve contained six particles. The third stub from the left front sleeve contained [12] particles. The fourth stub from the left rear sleeve contained six particles. Because the gunshot residue particles were discovered on the T-shirt, the other two items retrieved from Ms. Ayyash were not tested for gunshot residue particles.

Mr. Emira noted that it is more reliable to test someone's clothing rather than their hands. He explained that gunshot residue particles remain on clothing longer than a person's hands. The gunshot residue particles can be easily removed from a person's hands if the person wipes their hands on themselves, on another person or on a surface[,] or if the person sweats. A person's hands could be tested for the presence of gunshot residue particles only if they were immediately covered with an evidence bag. However, if the recovered clothing is properly stored in an evidence bag, then it can be submitted to the forensics laboratory for later analysis because the gunshot residue particles will not disappear.

Mr. Emira opined that the presence of gunshot residue particles on [Appellant's] bedding and clothing was consistent with testimony that [Appellant] fired a gun from his hospital bed. Mr. Emira noted that gunshot residue particles could be found within seven feet from where the shooting occurred. Mr. Emira further opined that the presence of gunshot residue particles on Ms. Ayyash's T-shirt was consistent with testimony that Ms. Ayyash came downstairs after the shooting, stepped over the victim's body, sat at the foot of [Appellant's] bed, and touched [Appellant]. Mr. Emira explained that a person can easily transfer gunshot residue particles to another person by touching the person or the person's clothing. Mr. Emira made these conclusions to a reasonable degree of scientific certainty.

On May 24, 2012, [Appellant] was arrested. On June 5, 2012, Detective McDermott executed a search warrant on the computers inside [Appellant's] house and submitted them to the forensics laboratory for examination. The forensics laboratory discovered that [Appellant's] computer

hard drive contained pornographic videos sent from Ms. Ayyash.

. . .

On May 13, 2014, [the trial court] heard a motion to suppress [Appellant's] statements and denied same. Thereafter, on May 19, 2014, the jury [found Appellant guilty of] first-degree murder and possession of an instrument of crime [(hereinafter "PIC")]. On that same day, [Appellant] was sentenced to life imprisonment without the possibility of parole.[4]

Trial Court Opinion, 6/26/15, at 1-14 (some internal citations omitted).

Following the denial of Appellant's post-sentence motion, Appellant filed a timely notice of appeal. Appellant raises four claims on appeal:

1. Did the trial court err in denying [Appellant's] motion to suppress his statement given on May 7, 2012 because (1) he was in custody and interrogated without *Miranda* warnings when he was transported to and held in the hospital at police direction, then surrounded by police, heavily medicated, and not permitted to leave; and (2) the statement was not voluntary as he was medicated, not able to leave, exhausted, and was viewed and treated as a suspect?

2. Did the trial court err in denying the motion to suppress [Appellant's] statement given to police on May 14, 2012 because both the statement and the waiver of his *Miranda* rights were involuntary as the conditions surrounding the interrogation showed he was medicated, treated like a suspect, unable to leave, and had already been coerced to provide an earlier involuntary and un-*Mirandized* statement?

_____

[4] The trial court sentenced Appellant to serve a concurrent term of two-and-a-half to five years in prison for PIC.

3. Was the verdict of first degree murder against the weight of the evidence where the Commonwealth's primary witness gave separate and significantly conflicting statements, had gun powder residue on her shirt, the firearm was found in a position in which [Appellant] was incapable of leaving it, and none of the other evidence presented by the Commonwealth established [Appellant's] guilt?

4. Where the undisputed evidence established that the decedent attacked, stole from and injured the [Appellant] over the course of a mostly uninterrupted violent fight and initiated the final confrontation, was the evidence insufficient to sustain a verdict of guilty of first degree murder rather than a voluntary manslaughter beyond a reasonable doubt?

Appellant's Brief at 5.

We have reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinion of the able trial court judge, the Honorable Sandy L. V. Byrd. We conclude that there has been no error in this case and that Judge Byrd's opinion, entered on June 26, 2015, meticulously and accurately disposes of Appellant's issues on appeal. Therefore, we affirm on the basis of Judge Byrd's opinion and adopt it as our own. In any future filings with this or any other court addressing this ruling, the filing party shall attach a copy of the trial court opinion.

Judgment of sentence affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/14/2016

- 15 -

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :      CP-51-CR-0008766-2012

v.      :      SUPERIOR COURT

BOHDAN CHAC      :      2830 EDA 2014

## OPINION

Byrd, J.      June 26, 2015

This case was tried before this court, sitting with a jury, commencing on May 13, 2014. On May 13, 2014, this court heard a motion to suppress defendant's statements and denied same. Thereafter, on May 19, 2014, the jury convicted defendant of first-degree murder and possession of an instrument of crime. On that same day, defendant was sentenced to life imprisonment without the possibility of parole. Shortly thereafter, defendant filed a post-sentence motion, which was denied by operation of law on September 29, 2014. On October 2, 2014, defendant filed a notice of appeal. Defendant was ordered to file a Statement of Matters Complained of on Appeal on October 20, 2014. On November 10, 2014, he filed a Preliminary Statement of Matters Complained of on Appeal due to an incomplete set of notes of testimony. Defendant filed a Supplemental Statement of Matters Complained of on Appeal on January 29, 2015.

**FILED**

JUN 2 6 2015

Criminal Appeals Unit
First Judicial District of PA

CP-51-CR-0008766-2012 Comm. v. Chac, Bohdan
Opinion



7312542491

On May 6, 2012, at around 10:00 p.m., defendant shot and killed Linda Raudenbush as she came down the stairs from the second floor of 3302 Fairdale Road in Philadelphia. Defendant shared this residence with Ms. Raudenbush, his common-law wife, and their twenty-six (26) year old son, David Chac. In November 2011, eighteen (18) year-old Sara Ayyash moved into this residence as defendant's girlfriend against the wishes of her mother, Angela Garland. Ms. Ayyash had been communicating with defendant on Facebook since May 2010. At that time, defendant was around fifty-five (55) years old and Ms. Ayyash was sixteen (16) years old. Their relationship turned sexual in November 2010 when Ms. Ayyash began to electronically send defendant pornographic photographs and videos. Defendant was partially paralyzed and Ms. Ayyash helped care for him during the period they lived together. N.T. 05/13/14, pp. 201-272; N.T. 05/14/14, pp. 7-101, 116-133.

During the period she lived with defendant, Ms. Ayyash was permitted to visit her mother about three to four times. In fact, she had visited her mother the weekend before the murder. On May 6, 2012 Ms. Ayyash returned to defendant's residence and found him and Ms. Raudenbush in the middle of an argument. At some point Ms. Ayyash got involved in the argument and threw a book at defendant after he insulted her. When Ms. Ayyash approached defendant, he pulled her hair. Ms. Raudenbush then approached defendant and bit his foot. Shortly thereafter, Ms. Ayyash and Ms. Raudenbush retreated upstairs. Later, Ms. Raudenbush went back downstairs to continue the argument. When Ms. Raudenbush reached the bottom of the stairs, she leaned toward defendant and yelled at him. In response, defendant sat upright in his hospital bed, extended his right arm, pointed his gun at Ms. Raudenbush and shot her in the left chest.

Ms. Raudenbush fell forward on the stairs. N.T. 05/13/14, pp. 201-272; N.T. 05/14/14, pp. 7-101, 116-133.

On May 6, 2012, at about 10:22 p.m., Police Officer Robert Francisco responded to a radio call about a person screaming at 3302 Fairdale Road. Within minutes, Officer Francisco arrived on location and encountered Rowena Wolfe-Paupst, who had called 911 after observing Ms. Ayyash waving a white rag from inside the second floor bedroom window of the residence. Officer Francisco exited the vehicle, looked up at the window and saw Ms. Ayyash screaming and waving the white rag. He attempted to communicate with Ms. Ayyash while she was in the window, but he could not understand her responses. Given the apparent urgency, Officer Francisco opened the unlocked front door and went inside. He announced his presence as he walked into the hallway, but did not receive any response. N.T. 05/13/14, pp. 151-200.

As Officer Francisco continued to walk down the hallway he saw defendant who was sitting upright in his hospital bed inside the living room, wearing a green Phillies T-shirt. Officer Francisco stated: "There is a woman waving a rag upstairs at the window for help. What's going on here?" Defendant stated that he did not know what happened because he had been asleep. Once inside the living room, Officer Francisco saw the deceased, Ms. Raudenbush, lying on the stairs with blood all over the front of her dress. Ms. Raudenbush's body was at the bottom of the stairs leading to the second floor, about five or six feet away from defendant's bed. Her feet were touching the stairs, and her upper body was wedged between the wall and a second hospital bed which was covered with clutter. Officer Francisco immediately called rescue. N.T. 05/13/14, pp. 151-200.

Officer Francisco then saw Ms. Ayyash standing at the top of the stairs and asked her to come downstairs to tell him what happened. She replied that the victim shot herself. Ms.

Ayyash told Officer Francisco that she did not see Ms. Raudenbush shoot herself, but that she had heard the gunshots. Officer Francisco then asked Ms. Ayyash why she had not called police, and she replied that she was too scared to call. Later, when Detective Gross responded to the scene and asked Ms. Ayyash if she had heard gunshots, she told him no. Officer Francisco then confronted Ms. Ayyash about this inconsistency, and she responded that she did hear gunshots. Immediately after Ms. Ayyash's reply, defendant said: "You didn't hear a gunshot. I had the movie Scarface on and that's what you heard. You didn't hear any gunshot." Officer Francisco again asked defendant if he had heard or seen anything and defendant cavalierly responded: "No, I don't know anything about it." Defendant's son was not home and Officer Francisco did not see anyone else inside the house. At trial, Detective Joseph McDermott, the assigned homicide investigator, stated that a video obtained from a Rite Aid store located at Academy Avenue and Byberry Road showed the son entering at 9:53 p.m. and exiting at 10:02 or 10:06 p.m. Detective McDermott stated that David Chac then walked "quite a distance" to return home. Detective N.T. 05/13/14, pp. 151-200; N.T. 05/15/14, pp. 125-126.

When the medics arrived to care for the victim, Officer Francisco observed a black gun, later identified as a CZ75 .9mm semi-automatic black pistol, lying upside down on the second hospital bed in the room. Officer Francisco secured the gun while Ms. Raudenbush received medical attention. The gun was later submitted to the Firearms Identification Unit for examination. At 10:45 p.m., Linda Raudenbush was pronounced dead inside the residence. At trial, Dr. Marlon Osbourne testified as an expert in forensic pathology. After performing an autopsy on the victim's body, Dr. Osbourne concluded to a reasonable degree of medical certainty that the cause of death was one gunshot wound to the chest. The bullet perforated Ms. Raudenbush's left lung, heart, and aorta. The bullet entered her left chest cavity and fractured

her fourth and fifth rib anteriorly. The bullet then lacerated the upper lobe of her left lung and traveled through the left ventricle of her heart. The bullet further lacerated her thoracic aorta and traveled into her eighth thoracic vertebra, where a fragment was retrieved. There was no exit wound on her body. Due to these injuries, Ms. Raudenbush was bleeding internally and she had one liter of clotted and liquid blood inside her left chest cavity. N.T. 05/13/14, pp. 151-200; N.T. 05/14/14, pp. 186-216.

After performing the autopsy, Dr. Osbourne further concluded to a reasonable degree of medical certainty that the manner of death was homicide, and not suicide or accident. Dr. Osbourne opined that the path of the bullet in the victim's body was consistent with testimony that the victim went to the bottom of the stairs and leaned over toward defendant before she was shot. Dr. Osbourne also observed that the gunshot wound was an irregular ovoid shape and had no soot, stipple or muzzle imprint around it. He explained that soot, a black stain, is present when the muzzle of a gun is within six inches to one foot from the victim's body. Stipple, an abrasion on the skin or hole in the clothing, is present when the muzzle of the gun is within two and one-half to three feet from the victim's body. A muzzle imprint is present once a gun has been pressed against the victim's skin. Because there was no soot, stipple or muzzle imprint around Ms. Raudenbush's gunshot wound, Dr. Osbourne concluded that the muzzle of the gun was farther than two and one-half to three feet away from the victim because one or all three of these indicators would have been present had the victim committed suicide. For these reasons, Dr. Osbourne concluded that a suicide had not occurred in this case. N.T. 05/14/14, pp. 186-216.

During the autopsy, Dr. Osbourne performed a toxicology test on Ms. Raudenbush and discovered 70 micrograms per deciliter of ethanol, less than 50 micrograms per liter of codeine, and less than 30 micrograms per liter of alprazolam (Xanax). Dr. Osbourne found that the

alcohol in the victim's body was less than the legal driving limit and that the levels of alprazolam and codeine were minimal. Consequently, Dr. Osbourne concluded to a reasonable degree of medical certainty that the drugs and alcohol found in Ms. Raudenbush's body did not contribute to her death. N.T. 05/14/14, pp. 186-216.

On May 7, 2012, at about 7:00 a.m., Police Officer Terry Tull arrived at the crime scene and began to take photographs. When Officer Tull went inside the residence, he encountered a cluttered living room containing two hospital beds. Defendant was sitting on one hospital bed, about seven feet away from the foot of the stairs where the victim's body was located. The other hospital bed was covered with clutter. Ms. Raudenbush's body had been slightly repositioned by responding medics who had attempted to resuscitate the victim. The dining room was impassable because it was piled high with clutter. Officer Tull further observed two bullet holes in the first floor ceiling of the main hallway that led to the living room. Given the cluttered state of defendant's house, Officer Tull used trajectory probes to determine the path the bullets traveled. Based on his training and experience, Officer Tull determined that the trajectory probes pointed toward defendant's bed. As a result, Officer Tull concluded that the gun was fired from defendant's bed. N.T. 05/14/14, pp. 15-72.

A search warrant was obtained for the residence. However, both Ms. Ayyash and David Chac, who arrived at some point after the murder, were transported to Northeast Detectives to be interviewed before it was executed. Defendant was transported to Aria Torresdale Hospital due to his medical condition. Before defendant was transported to the hospital, Detective John Hopkins retrieved the green Phillies T-shirt and the red shorts that defendant had worn on the day of the murder. These items were bagged separately and submitted to the forensics laboratory for gunshot residue testing. After defendant was transported to the hospital, Detective Hopkins

recovered one blue comforter, two bed sheets, and one pillow from defendant's hospital bed. These items were bagged separately and submitted to the forensics laboratory for gunshot residue testing. He also recovered a black Action Arms pistol case for the CZ75 .9mm pistol and one metal magazine containing a .9mm round. Officer Tull then moved defendant's bed and the surrounding clutter and began to search for projectiles. Officer Tull found three fired cartridge casings under the rear of defendant's bed. Two of the fired cartridge casings were about one and one-half feet apart from each other. No other fired cartridge casings were recovered from the residence. N.T. 05/14/14, pp. 137-186; N.T. 05/15/14, pp. 15-72.

On May 7, 2012, at 11:54 a.m., Detective Tim Lynch interviewed defendant while he was inside an emergency room treatment cubicle. Detective Hopkins and Sergeant Hendershot were also present. During this interview, defendant appeared alert and answered the detective's questions. He did not appear to be under the influence of drugs. After the interview, Detective Lynch provided defendant the opportunity to review the written statement. However, defendant refused to sign the statement.[1] On May 14, 2012, at 11:50 a.m., Detective McDermott

---

[1] On May 7, 2014, the following questions were asked by Detective Lynch and answered by defendant:

[Detective Lynch]:    What happened last night at your home?

[Defendant]:    Sara got home around 5:00 p.m. or 6:00 p.m. My wife tried to grab some of my pills. It was some of my Ambien and my Tylenol 4. I was getting a bath from my son at that time. She came to get the pills and I pushed her away with my right foot. She bit my foot. My son told her to go away. She went upstairs. She had hit me in the face with something. After she left I noticed that I had a bloody nose. I yelled up to her that I was going to act on a letter that I got from the 8th District. The letter said the police knew I was being abused. I also told her I was going to call the DA. I took 2 Xanax & an Ambien. I tried to get YouTube on to put me to sleep. I just woke up a while later. I noticed a Scarface clip was playing and music playing. I was trying to go back to sleep. I got woken up by a police officer who was knocking and he came in. Before I fell asleep I sent my son to Rite Aid. I had 2 guns near me when I went to sleep. As far as I know neither had bullets in them. I took the bullets out.

[Detective Lynch]:    Which guns did you unload?

interviewed defendant inside his residence.  Although defendant was not under arrest, Detective

---

[Defendant]:            Smith & Wesson Bodyguard .38 (snub nose, shroud hammer, nickel, brown wood handle) C275 .9mm (black auto)

[Detective Lynch]:        Did you unload the guns yourself?

[Defendant]:            Around 2 weeks ago I pulled out the clip of the CZ75.  If I felt danger at night sometimes I put the clip back in.

[Detective Lynch]:        Are you able to unload the gun and clear the chamber by yourself?

[Defendant]:            I can unload it, but not clear the chamber.  My left hand doesn't work.

[Detective Lynch]:        Was the CZ75 loaded last night?

[Defendant]:            I thought it was unloaded.  It's possible I may have put the clip in 2 days ago.

[Detective Lynch]:        When was the last time you saw Linda alive?

[Defendant]:            When she went upstairs.

[Detective Lynch]:        What time was that?

[Defendant]:            Early evening.  I'm not sure.

[Detective Lynch]:        Where did you put the CZ75 magazine when you remember taking it out?

[Defendant]:            On the left of the bed.  Down in a drawer thing.

[Detective Lynch]:        Where was the CZ75?

[Defendant]:            In a box on my right side on the bed next to me.

[Detective Lynch]:        Was it within reach?

[Defendant]:            Yes.

[Detective Lynch]:        Did you hear any gunshots last night?

[Defendant]:            Yes.  When I woke up I heard them on YouTube.  There were a lot of shots at the end of the movie.

[Detective Lynch]:        How do you think Linda was shot?

[Defendant]:            I have no idea.  I don't know if someone came in and tried to shoot her and maybe she got shot.

[Detective Lynch]:        Did you fire your CZ75 last night?

[Defendant]:            No.

[Detective Lynch]:        When was the last time you did fire a gun?

[Defendant]:            Years ago.

[Detective Lynch]:        Is there anything else that you want to add?

[Defendant]:            No.

N.T. 05/14/14, pp. 146-150; Commw. Exh. 27.

Detective McDermott read him his Miranda rights. Defendant indicated that he understood the warnings. He also appeared coherent, alert, and able to understand English. Defendant did not state at any point during this interview that he wished to invoke his right to a lawyer or right of silence. When the detectives first arrived at the residence, defendant paid them no attention. Instead, defendant used his computer until he was asked to focus on the interview. While defendant used his computer, Detective McDermott observed that defendant had full use of the right side of his body. He moved the computer mouse and wrote inside a notepad with his right hand and pulled himself upright with his right arm. Defendant also used his right hand when he pointed and told Detective McDermott where he kept his gun. During the interview, defendant closed his eyes when he was asked about the murder. He also had no explanation for the bullet holes in the ceiling. Conversely, defendant responded to questions pertaining to what occurred before and after the murder. Detective McDermott interviewed defendant for about one hour. When Detective McDermott returned to his office, he memorialized this interview in a memorandum.[2] During this informal interview, defendant denied the detective's request to submit to a formal interview. N.T. 05/14/14, pp. 137-186; N.T. 05/15/14, pp. 105-150.

---

[2] Detective McDermott summarized defendant's account of what happened before the incident:

> He had said that him and Linda were fighting all day, and that Linda and Sara went upstairs. And then he used to keep his CZ pistol next to him for protection. And then next thing he remembers was the police waking him up. He doesn't know – the police officer says there is a woman laying over here. This is what the police officer – I don't think that's in here – that the police officer woke him up and said something about a woman laying there, and he couldn't see over there.
>
> Then I said something about Sara saying something about him hollering up. That's when he closed his eyes. Then he was saying about the Scarface movie being on, and he doesn't remember how it got on, and that must have been the gunshots. Then I asked him about the bullet holes that were in the ceiling and he didn't know nothing about that.

N.T. 05/15/14, pp.119-120; Commw. Exh. 29.

*Commw. v. Bohdan Chac*                    Page 9 of 36

Ms. Ayyash provided five different statements to police concerning this incident. On May 7, 2012, at 3:00 a.m., Ms. Ayyash was interviewed by Detective Lynch at Northeast Detectives. In that statement, Ms. Ayyash asserted that she did not know what happened and that she did not hear anything. During that interview, the detectives confiscated Ms. Ayyash's gray short sleeve T-shirt, sweatpants, and underwear. These items were bagged separately and submitted for gunshot residue testing. On that same day, at 2:30 p.m., Ms. Ayyash was interviewed a second time by Detective Lynch. In that statement, Ms. Ayyash told Detective Lynch about the argument that occurred before the shooting. Ms. Ayyash also told Detective Lynch that she heard two "quick pops" after Ms. Raudenbush went down the stairs. Ms. Ayyash stated that she was at the top of the stairs when she heard this noise. Ms. Ayyash also stated that she asked defendant "What did you do?" after observing the decedent half standing and half slumped at the base of the stairs. She told Detective Lynch that defendant stated to her: "Shut the fuck up." In response, she told defendant that she would not say anything and asked him why he did it. She then ran into a bedroom, shut the door and waved the white rag out of the second floor window for help. N.T. 05/13/14, pp. 201-272; N.T. 05/14/14, pp. 7-101; N.T. 05/15/14, pp. 105-150.

At 6:55 p.m., Ms. Ayyash gave a third statement. During this interview, she provided details about her relationship with defendant and identified defendant from a photograph. On May 17, 2012, at 2:50 p.m., Ms. Ayyash gave a fourth statement to Detective McDermott, and Detective (now Sergeant) Vince Rodden. After being shown a photograph from the crime scene, Ms. Ayyash marked "X" where defendant normally kept his semi-automatic gun and marked "G" where defendant's gun was found after the shooting. On October 26, 2012, at 6:00 p.m., Ms. Ayyash gave a fifth statement to Detective McDermott. In that statement, Ms. Ayyash said

that she saw sparks from the gun. On July 25, 2012 Ms. Ayyash testified at defendant's preliminary hearing that she and Ms. Raudenbush drank alcohol after they retreated upstairs following the argument. At trial, Ms. Ayyash stated for the first time that she saw defendant's arm extended before hearing gunshots and seeing Ms. Raudenbush fall forward on the stairs. She also stated that defendant threatened her when she was at the top of the stairs, telling her that she was next. Ms. Ayyash explained that she had received counseling after providing the detectives her statements and testifying at the preliminary hearing and that she now wanted to "tell the whole truth." N.T. 05/13/14, pp. 201-272; N.T. 05/14/14, pp. 7-101; N.T. 05/15/14, pp. 105-150.

At trial, Police Officer Ronald Weitman testified as an expert in firearms and ballistics testing. He received the ballistics evidence and prepared a report after conducting an examination. The CZ75 semi-automatic .9mm Luger gun contained 12 live .9mm Luger cartridges inside even though it had the capacity to hold seventeen (17) cartridges. In addition to confirming the gun's operability, Officer Weitman found that it loudly fired bullets in close quarters. Officer Weitman also received the three .9mm Luger fired cartridge casings recovered from defendant's residence and compared them to the fired cartridge casings expelled from the CZ75 gun when it was test-fired. He found that the fired cartridge casings were similar to each other. He also discovered that the fired cartridge casings ejected to the right and to the rear when the gun was fired. After analyzing this evidence, Officer Weitman concluded to a reasonable degree of scientific certainty that the three fired cartridge casings recovered from defendant's residence were fired from the CZ75 semi-automatic gun. N.T. 05/15/14, pp. 73-103.

Officer Weitman further concluded to a reasonable degree of scientific certainty that the ballistics evidence was consistent with testimony that defendant extended his right hand, held the

gun, and shot the victim. Officer Weitman based his conclusion on the trajectory probes that pointed toward defendant's bed, the location of the three fired cartridge casings found behind defendant's bed, and the way that the fired cartridge casings ejected from the gun. Officer Weitman further opined that the fired cartridge casings would have been found within the area of the body if the killing had been self-inflicted. N.T. 05/15/14, pp. 73-103.

Officer Weitman also received the bullet jacket fragment and fragment pieces that the medical examiner retrieved from Ms. Raudenbush's body. Officer Weitman opined that a bullet can fragment when it penetrates two hard ribs. Although the bullet jacket was torn, Officer Weitman was still able to determine that it was .9mm because the base diameter was intact. After comparing the bullet jacket fragment to the recovered fired cartridge casings, Officer Weitman concluded that the bullet jacket had been fired from the same gun because they had the same projectile design. On June 13, 2012, Officer Tull manually examined the CZ75 gun and found no fingerprints. Although the gun was not submitted for DNA testing, defendant admitted his ownership of the weapon to police. N.T. 05/15/14, pp. 73-103.

At trial, Gamal Emira testified as an expert in gunshot residue testing and forensic science. Mr. Emira reviewed the criminalistics report prepared by Francis Padayatty, who received and examined defendant's green Phillies short sleeve T-shirt, one blue twin comforter, one light blue bed sheet, one yellow bed sheet, and one pillow. These items were stubbed and a scanning electron microscope was used to search for gunshot residue particles on the bedding and the clothing. A stub is aluminum, rounded and covered with double-sided carbon tape, which easily transfers any particle from a garment. The scanning electron microscope uses an electron beam and magnifies each particle up to 100,000 times. Mr. Emira explained that the presence of gunshot residue particles on a person's clothing indicated either that the person fired

the gun, that the person was within six to seven feet of the fired gun, or that the person touched a surface covered with gunshot residue particles. N.T. 05/14/14, pp. 217-272.

Defendant's T-shirt was stubbed four times. The first stub from the front right sleeve contained nine gunshot residue particles. The second stub from the back right sleeve contained thirteen gunshot residue particles. The third stub from the front left sleeve contained eight gunshot residue particles. The fourth stub from the rear left sleeve contained eight gunshot residue particles. Defendant's shorts were not tested. The stub from defendant's comforter contained one particle. The stub from defendant's light blue bed sheet contained nine gunshot residue particles. The stub from defendant's yellow bed sheet contained two gunshot residue particles. The stub from defendant's pillow contained one particle. Ms. Ayyash's T-shirt was also examined and stubbed four times. The first stub from the front right sleeve of the T-shirt contained four particles. The second stub from the rear right sleeve contained six particles. The third stub from the left front sleeve contained twelve particles. The fourth stub from the left rear sleeve contained six particles. Because the gunshot residue particles were discovered on the T-shirt, the other two items retrieved from Ms. Ayyash were not tested for gunshot residue particles. N.T. 05/14/14, pp. 217-272.

Mr. Emira noted that it is more reliable to test someone's clothing rather than their hands. He explained that gunshot residue particles remain on clothing longer than a person's hands. The gunshot residue particles can be easily removed from a person's hands if the person wipes their hands on themselves, on another person or on a surface or if the person sweats. A person's hands could be tested for the presence of gunshot residue particles only if they were immediately covered with an evidence bag. However, if the recovered clothing is properly stored in an

evidence bag, then it can be submitted to the forensics laboratory for later analysis because the gunshot residue particles will not disappear. N.T. 05/14/14, pp. 217-272.

Mr. Emira opined that the presence of gunshot residue particles on defendant's bedding and clothing was consistent with testimony that defendant fired a gun from his hospital bed. Mr. Emira noted that gunshot residue particles could be found within seven feet from where the shooting occurred. Mr. Emira further opined that the presence of gunshot residue particles on Ms. Ayyash's T-shirt was consistent with testimony that Ms. Ayyash came downstairs after the shooting, stepped over the victim's body, sat at the foot of defendant's bed, and touched defendant. Mr. Emira explained that a person can easily transfer gunshot residue particles to another person by touching the person or the person's clothing. Mr. Emira made these conclusions to a reasonable degree of scientific certainty. N.T. 05/15/14, pp. 217-272.

On May 24, 2012, defendant was arrested. On June 5, 2012, Detective McDermott executed a search warrant on the computers inside defendant's house and submitted them to the forensics laboratory for examination. The forensics laboratory discovered that defendant's computer hard drive contained pornographic videos sent from Ms. Ayyash. N.T. 05/15/14, pp. 105-150.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Defendant raised the following issues in his Supplemental Statement of Matters Complained of on Appeal, in accordance with Pennsylvania Rule of Appellate Procedure 1925(b)[3]:

> (a) Where the undisputed evidence established that the decedent argued with, bit, hit, and injured the appellant over the course of a mostly uninterrupted violent fight and initiated the final confrontation, was not the evidence insufficient to sustain a

---

[3] The following is a verbatim account of defendant's Statement.

verdict of guilty of first degree murder rather than voluntary manslaughter?[4]

(b) Was not the verdict of first degree murder against the weight of the evidence where the Commonwealth's primary witness gave separate and significantly conflicting statements, had gun powder residue on her shirt, the firearm was found in a position in which appellant was incapable of leaving it, and even if appellant had fired the gun, the evidence was much more consistent with voluntary manslaughter than first degree murder?

(c) Did the trial court err in denying appellant's motion to suppress appellant's statement given on May 7, 2012 because (1) he was in custody and interrogated without Miranda warnings when he was transported to and held in the hospital at police direction, then surrounded by police, heavily medicated, and not permitted to leave; and (2) the statement was not voluntary as he was medicated, not able to leave, exhausted, and was viewed and treated as a suspect?

(d) Did the trial court err in denying the motion to suppress appellant's statement given to police on May 14, 2012 because both the statement and the waiver of his Miranda rights were involuntary as the conditions surrounding the interrogation showed he was medicated, treated like a suspect, unable to leave, and had already been coerced to provide an earlier involuntary and un-Mirandized statement?

(e) Did the trial court err in allowing the Sara Ayyash to testify regarding her experiences years earlier of losing her virginity, difficulty with friendships, and being bullied in school, as well as allowing her mother, Angela Garland, to testify to similar evidence where the facts are irrelevant and prejudicial.

---

[4] The issues raised in (a) to (d) of defendant's Supplemental Statement of Matters Complained of on Appeal are essentially identical to the issues raised in (a) to (c) of his Preliminary Statement of Matters Complained of on Appeal. In addition to raising those issues, defendant raised the following issue in his Preliminary Statement:

(d) Did the trial court err in allowing Angela Garland to testify regarding her attempts to seek law enforcement intervention, appellant's statements and demeanor during phone conversations, Sara Ayyash's relationships with other friends, and that Ayyash needed appellant's permission to see her sick brother because the statements constitute hearsay, call for speculation, are attempts to backdoor impermissible character evidence, and are otherwise irrelevant?

## DISCUSSION

Defendant first claims that there was insufficient evidence to convict him of first-degree murder and possession of an instrument of crime. When evaluating whether the evidence was sufficient to sustain a conviction, the court "must view the evidence in the light most favorable to the Commonwealth as verdict winner, accept as true all the evidence and all reasonable inferences upon which, if believed, the jury could properly have based its verdict, and determine whether such evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Tate*, 485 Pa. 180, 182, 401 A.2d 353, 354 (1979). In applying this test, "the entire record must be evaluated and all evidence actually received must be considered." *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001) (quoting *Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000)).

The "question of any doubt regarding the facts and circumstances established by the Commonwealth is for the fact-finder to resolve unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Costa-Hernandez*, 802 A.2d 671, 675 (Pa. Super. 2002). Further, "it is for the fact finder to make credibility determinations, and the finder of fact may believe all, part or none of a witness's testimony." *Commonwealth v. Mack*, 850 A.2d 690, 693 (Pa. Super. 2004). In *Commonwealth v. Geiger*, 475 Pa. 249, 254, 380 A.2d 338, 340 (1977), the court held that "[t]he Commonwealth must indeed prove every element of a crime beyond a reasonable doubt in order to sustain a valid conviction for that crime." The Commonwealth may meet this burden by presenting "wholly circumstantial evidence." *Commonwealth v. Williams*, 615 A.2d 416, 418 (Pa. Super. 1992). *See also Commonwealth v. Cox*, 460 Pa. 566, 569, 333 A.2d 917, 918 (1975)

(holding that "[i]t is well established in Pennsylvania that circumstantial evidence alone may be sufficient to determine commission of a crime and convict the accused of it").

In this case, the Commonwealth proved beyond a reasonable doubt that defendant was guilty of the crimes charged. To convict an individual of first-degree murder, "the Commonwealth must prove beyond a reasonable doubt that the defendant acted with malice and a specific intent to kill, that a human being was unlawfully killed, that the defendant committed the killing, and that the killing was intentional, deliberate and premeditated." *Commonwealth v. Chamberlain*, 612 Pa. 107, 129, 30 A.3d 381, 394 (2011), *cert. denied*, 132 S. Ct. 2377 (2012). *See also* 18 Pa. C.S. §2502(a), (d). In *Commonwealth v. Hare*, 486 Pa. 123, 129, 404 A.2d 388, 391 (1979), the court explained that "[m]alice will be found if the actor committed a killing with an intent to kill[.]"

In *Commonwealth v. Chambers*, 602 Pa. 224, 245, 980 A.2d 35, 47 (2009), *cert. denied*, 560 U.S. 928 (2010), the court held that "the specific intent to kill can be formed in a fraction of a second, and may be found whenever the defendant acts with a conscious purpose to bring about the death of the victim." *See also Commonwealth v. Agie*, 449 Pa. 187, 190, 296 A.2d 741, 742 (1972) (explaining that specific intent to kill "may be found from a defendant's words or conduct"). *See also Commonwealth v. Sattazahn*, 631 A.2d 597, 602 (Pa. Super. 1993) (holding that "[a] specific intent to kill can be inferred from the circumstances surrounding an unlawful killing"); *Commonwealth v. Austin*, 575 A.2d 141, 154 (Pa. Super. 1990) (holding that "[m]alice may be inferred from the attending circumstances"). In *Commonwealth v. Fisher*, 564 Pa. 505, 518, 769 A.2d 1116, 1124 (2001), *cert. denied*, 535 U.S. 906 (2002), the court noted that "[p]remeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death."

Here, the evidence shows that defendant sat upright in his hospital bed, extended his right arm, pointed his CZ75 semi-automatic pistol at Ms. Raudenbush, and shot her as she came down the stairs of their residence. Although defendant was partially paralyzed, testimony established that he had full use of his right arm and hand. Thus, defendant cannot claim that he was physically incapable of committing this crime. By introducing this evidence, the Commonwealth proved beyond a reasonable doubt that defendant committed first-degree murder. Certainly, defendant's conduct was the product of premeditation and deliberation. *See Fisher*, 564 Pa. at 517, 769 A.2d at 1124 (holding that "[t]he period of reflection necessary to constitute premeditation may be very brief; in fact, the design to kill can be formulated in a fraction of a second").

Defendant's conduct further exhibited malice and specific intent to kill as he shot Ms. Raudenbush, who was unarmed, in her left chest within close range, causing irreparable damage to her vital body organs. *See Commonwealth v. Holley*, 945 A.2d 241 (Pa. Super. 2008) (holding that a defendant's intent can be proven by direct or circumstantial evidence). Indeed, "[s]pecific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Padilla*, 622 Pa. 449, 461, 80 A.3d 1238, 1244 (2013), *cert. denied*, 134 S.Ct. 2725 (2014). *See Commonwealth v. Bond*, 539 Pa. 299, 305, 652 A.2d 308, 311 (1995) (noting that a gun is "clearly a deadly weapon"); *Commonwealth v. Solano*, 588 Pa. 716, 736, 906 A.2d 1180, 1192 (2006), *cert. denied*, 550 U.S. 938 (2007) (noting that one of the factors that "weighs in on the element of intent" is "the precise distance from which the bullets were fired"); *Commonwealth v. Rodgers*, 500 Pa. 405, 409, 456 A.2d 1352, 1354 (1983) (ruling that a shotgun fired within short range of the victim "establishes the specific intent to take life"); *Commonwealth v. Davis*, 491 Pa. 363, 421 A.2d 179 (1980) (holding that the

Commonwealth established specific intent to kill through evidence that defendant shot unarmed victim); *Commonwealth v. Chine*, 40 A.3d 1239, 1242 (Pa. Super. 2012) (holding that evidence of defendant shooting an "unsuspecting, unarmed" victim clearly indicated specific intent to kill and malice).

At trial, Dr. Osbourne testified as an expert in forensic pathology and concluded to a reasonable degree of medical certainty that the cause of Ms. Raudenbush's death was one gunshot wound to her left chest. The bullet entered her left chest and perforated her left lung, heart, and aorta. The bullet did not exit Ms. Raudenbush's body. Instead, it was retrieved from her eighth thoracic vertebra. As a result, Ms. Raudenbush bled internally and had about one liter of blood inside her left chest cavity. *See* N.T. 05/14/14, p. 194 (forensic pathology expert confirming that the heart, lung, and aorta are vital parts of the body). In addition to determining the cause of death, Dr. Osbourne concluded to a reasonable degree of medical certainty that the manner of death was homicide. There was no evidence that Ms. Raudenbush's death resulted from suicide, accident or natural causes. There was no soot, stipple or muzzle imprint around the gunshot wound. Dr. Osbourne noted that one or all of these indicators would have been present had the gunshot wound been self-inflicted. Instead, the path of the bullet and the absence of soot, stipple or a muzzle imprint was consistent with testimony that defendant shot and killed the victim.

The Commonwealth also presented ballistics evidence that directly pointed to defendant as the shooter. At trial, testimony established that the trajectory of the two bullet holes in the ceiling pointed toward defendant's bed. When police searched behind defendant's bed, they recovered three fired cartridge casings under the rear of his bed. They also found the murder weapon, one CZ75 .9mm semi-automatic black pistol. At trial, Police Officer Weitman stated

that the fired cartridge casings would have been found close to the victim's body if she had committed suicide. Officer Weitman also stated that the location of the trajectory probes and the fired cartridge casings further established that the gun was fired from defendant's bed. After test-firing defendant's CZ75 gun and comparing those fired cartridge casings to the three .9mm fired cartridge casings recovered from defendant's residence, Officer Weitman concluded to a reasonable degree of scientific certainty that the recovered fired cartridge casings were fired from defendant's gun. Officer Weitman also concluded to a reasonable degree of scientific certainty that the bullet jacket fragment retrieved from the victim's body was fired from defendant's gun because it had the same rib impressions and same caliber.

In addition to this ballistics evidence, defendant's T-shirt, comforter, bed sheets, and pillow were submitted to the forensic laboratory for gunshot residue testing. Mr. Gamal Emira testified as a forensic science expert and concluded to a reasonable degree of scientific certainty that gunshot residue particles were present on these items. Mr. Emira opined that the presence of gunshot residue particles on defendant's bedding and clothing was consistent with testimony that defendant fired a gun from his bed. Mr. Emira further opined that the presence of gunshot residue particles on Ms. Ayyash's T-shirt was consistent with testimony that she came downstairs after the shooting and touched defendant. According to Mr. Emira, a person can easily transfer gunshot residue particles to another person by touching the person or the person's clothing. Contrary to defendant's position, trial testimony, ballistics evidence and forensic evidence directly pointed to him as the perpetrator of this killing. In light of these facts, the Commonwealth proved beyond a reasonable doubt that defendant was guilty of first-degree murder. Therefore, there was sufficient evidence to convict defendant of this offense.

As stated above, defendant was convicted of possession of an instrument of crime. Section 907 of the Crimes Code provides that a defendant is guilty of this offense when he "possesses any instrument of crime with intent to employ it criminally." 18 Pa. C.S. §907(a). An instrument of crime is "[a]nything specially made or specially adapted for criminal use" or "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa. C.S. §907(d). In this case, the facts clearly show that defendant possessed a gun with the intent to commit first-degree murder against Ms. Raudenbush. *See Commonwealth v. Stokes*, 38 A.3d 846, 854 (Pa. Super. 2011) (holding that "[i]t is undisputed that a gun can be an instrument of crime"). Indeed, trial testimony, ballistics and forensic evidence established that defendant possessed a CZ75 semi-automatic pistol and that he used it to shoot and kill Ms. Raudenbush. Based on these facts, the Commonwealth proved beyond a reasonable doubt that defendant possessed an instrument of crime. Accordingly, there was sufficient evidence that defendant was guilty of this offense.

In raising a sufficiency claim, defendant contends that the Commonwealth did not sufficiently link him to the crimes with which he was charged. However, in *Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977), the court ruled that "it is not necessary that each piece of evidence be linked to the defendant beyond a reasonable doubt. It is only necessary ... that the combination of evidence link the defendant to the crime beyond a reasonable doubt." As noted by the above discussion, the combination of evidence presented by the Commonwealth proved beyond a reasonable doubt that defendant committed first-degree murder and possession of an instrument of crime. Consequently, defendant's sufficiency challenge cannot prevail.

Defendant next claims that the verdict was against the weight of the evidence. A new trial will be granted on this basis "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. VanDivner*, 599 Pa. 617, 630, 962 A.2d 1170, 1177 (2009), cert. denied, 559 U.S. 1038 (2010). In reviewing whether the verdict was against the weight of the evidence, the trial court must exercise its discretion in determining whether " 'certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' " *Commonwealth v. Widmer*, 560 Pa. 308, 320, 744 A.2d 745, 752 (2000) (quoting *Thompson v. Philadelphia*, 507 Pa. 592, 601, 493 A.2d 669, 674 (1985)). The appellate court's review "is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Commonwealth v. Diggs*, 597 Pa. 28, 39, 949 A.2d 873, 879 (2008), *cert. denied*, 556 U.S. 1106 (2009). In this case, defendant has not pointed to any evidence that should have been accorded greater, lesser or equal weight than the evidence that was already introduced at trial. Moreover, the jury arrived at its verdict after giving due consideration to all relevant and properly admitted evidence.

In raising a weight of the evidence claim, defendant points to "separate and significantly conflicting statements" provided by a Commonwealth witness. However, defendant cannot obtain relief on this basis. *See Commonwealth v. Price*, 616 A.2d 681, 685 (Pa. Super. 1992) (holding that "any conflict in the testimony goes to the credibility of the witnesses and is solely to be resolved by the factfinder"). As the court held in *Commonwealth v. Blakeney*, 596 Pa. 510, 523, 946 A.2d 645, 653 (2008), *cert. denied*, 555 U.S. 1177 (2009), a new trial cannot be granted "merely because of some conflict in testimony or because the judge would reach a different conclusion on the same facts, but should only do so in extraordinary circumstances[.]"

Certainly, it is solely "within the province of the jury as fact-finder to resolve all issues of credibility, resolve conflicts in evidence, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately adjudge [the defendant] guilty." *Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa. Super. 2006). The jury's verdict clearly demonstrates that it exercised its lawful duty as fact finder and resolved any conflicting evidence in the light most favorable to the Commonwealth. Consequently, defendant's claim has no merit.

Defendant further challenges the sufficiency of evidence by arguing that the evidence supports a voluntary manslaughter conviction rather than a first-degree murder conviction. In challenging the jury's verdict, defendant highlights that he and the decedent were involved in a heated argument prior to the murder. In *Commonwealth v. Cox*, 546 Pa. 515, 539, 686 A.2d 1279, 1291 (1996), *cert. denied*, 522 U.S. 999 (1997), the court explained that the crime of voluntary manslaughter "involves a killing in a sudden and intense passion resulting from a serious provocation or an unreasonable belief in self-defense." Voluntary manslaughter "is an appropriate verdict for 'heat of passion' killings, where, 'at the time of the killing, [the defendant] acted under sudden and intense passion [due to] serious provocation by the victim.' " *Commonwealth v. Kim*, 888 A.2d 847, 853 (Pa. Super. 2005) (quoting *Commonwealth v. Thomas*, 552 Pa. 621, 640, 717 A.2d 468, 477 (1998), *cert. denied*, 528 U.S. 827 (1999)). Specifically, heat of passion includes "emotions such as anger, rage, sudden resentment or terror, which renders the mind incapable of reason." *Commonwealth v. Speight*, 544 Pa. 451, 467, 677 A.2d 317, 324-325 (1996), *abrogated on other grounds by Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), *cert. denied*, 543 U.S. 822 (2004).

In *Commonwealth v. Copeland*, 554 A.2d 54, 57 (Pa. Super. 1988), the court explained that "[t]he passion which will reduce an unlawful killing to voluntary manslaughter must be caused by legally adequate provocation." The law "is quite explicit that the determination of whether a certain quantum of provocation is sufficient to support the defense of voluntary manslaughter is purely an objective standard." *Commonwealth v. McCusker*, 448 Pa. 382, 389, 292 A.2d 286, 289 (1972). In determining whether there was serious provocation, one must consider " 'whether a reasonable [person] confronted by the same series of events, would become impassioned to the extent that his mind would be incapable of cool reflection.' " *Kim*, 888 A.2d at 853 (quoting *Commonwealth v. Galloway*, 485 A.2d 776, 783 (Pa. Super. 1984)).

Here, the jury was equipped with clear and legally accurate instructions defining first-degree murder, third-degree murder, and voluntary manslaughter before they engaged in deliberations. After being provided with those instructions, the jury found defendant guilty of first-degree murder instead of third-degree murder or voluntary manslaughter. The jury's verdict was supported by sufficient evidence that defendant intentionally shot and killed the victim within close range. Although defendant and the victim had been involved in an argument prior to the shooting, defendant was not subjected to serious provocation that created a sudden and intense passion rendering him incapable of cool reflection. *See, e.g., Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277 (2011), cert. denied, 132 S.Ct. 2711 (2012) (holding that the defendant was not sufficiently provoked into heat of passion by argument with victim occurring shortly before murder or by other serious issues in relationship); *Commonwealth v. Frederick*, 508 Pa. 527, 534, 498 A.2d 1322, 1325 (1985) (holding that evidence of the defendant and the victim arguing before murder and having a "stormy love affair" was insufficient evidence of voluntary manslaughter); *Commonwealth v. Walters*, 431 Pa. 74, 244

A.2d 757 (1968) (holding that there was insufficient evidence that defendant killed in heat of passion after the victim argued with and cursed at the defendant prior to the murder); *Commonwealth v. Robinson*, 452 Pa. 316, 323, 305 A.2d 354, 358 (1973) (reiterating principle that "no words of provocation, reproach or slight assault are sufficient to reduce a homicide to voluntary manslaughter").

By finding defendant guilty of first-degree murder, the jury found insufficient evidence of defendant killing in a sudden and intense passion resulting from a serious provocation. Even if sufficient provocation existed, the jury's verdict indicates that it found defendant had a sufficient cooling period to reasonably regain the capacity to reflect and respond in a civil and non-violent manner. *See Commonwealth v. Rivers*, 557 A.2d 5, 9 (Pa. Super. 1989) (instructing that even "[i]f sufficient provocation exists, the fact finder must also determine whether the defendant actually acted in the heat of passion when he committed the homicide and thus whether the provocation led directly to the killing or whether there was a sufficient 'cooling' period so that a reasonable man would have regained his capacity to reflect"). As previously discussed, there was sufficient evidence proving that defendant possessed the specific intent to kill and acted with malice when he murdered the victim. *See Commonwealth v. Whitfield*, 475 Pa. 297, 303, 380 A.2d 362, 365 (1977) (explaining that "[t]he gravamen of both murder of the first degree and voluntary manslaughter, as distinguished from murder, however, is the lack of malice in the legal sense of that term"); *Commonwealth v. Pirela*, 510 Pa. 43, 51, 507 A.2d 23, 27 (1986) (quoting *Commonwealth v. Berry*, 461 Pa. 233, 237, 336 A.2d 262, 264 (1975), which noted that voluntary manslaughter "is a concession to the infirmity of human nature, not an excuse for undue or abnormal irascibility"). Indeed, it is well-settled that the court "may not substitute its judgment for that of the fact-finder." *Commonwealth v. Goins*, 867 A.2d 526, 528

(Pa. Super. 2004). *See also Commonwealth v. Sinnott*, 612 Pa. 321, 331, 30 A.3d 1105, 1110 (2011) (explaining that "the critical inquiry is not whether the court believes the evidence established guilt beyond a reasonable doubt, but whether the evidence believed by the fact-finder was sufficient to support the verdict"). In light of these legal principles, the jury's verdict may not be overturned. *See Commonwealth v. Leonhard*, 485 A.2d 444, 446 (Pa. Super. 1984) (holding that the court may not "remove from the jury its responsibility to decide the degree of culpability"). Consequently, defendant cannot obtain relief on this basis.

Defendant next argues that this court erred in denying his motion to suppress the two statements that he provided to police. When reviewing a challenge to the suppression court's ruling, the appellate court is bound by the suppression court's findings of fact so long as they are supported by the record. *Commonwealth v. Chandler*, 505 Pa. 113, 477 A.2d 851 (1984). The appellate court will reverse this court's decision " 'only if there is an error in the legal conclusions drawn from those findings.' " *Commonwealth v. Basking*, 970 A.2d 1181, 1187 (Pa. Super. 2009) (quoting *Commonwealth v. Hill*, 874 A.2d 1214, 1216 (Pa. Super. 2005)). Thus, the appellate court considers "whether the suppression court properly applied the law to the facts of the case." *Commonwealth v. Ruey*, 586 Pa. 230, 240, 892 A.2d 802, 807 (2006).

In cases where the defendant's motion to suppress has been denied, the appellate court will " 'consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' " *In re J.V.*, 762 A.2d 376, 379 (Pa. Super. 2000) (quoting *Commonwealth v. Reddix*, 513 A.2d 1041, 1042 (Pa. Super. 1986)). Our Superior Court has held that "it is the sole province of the suppression court to weigh the credibility of the witnesses. .... Further, the suppression court judge is entitled to believe all, part or none of the evidence presented." *Commonwealth v.*

*Benton*, 655 A.2d 1030, 1032 (Pa. Super. 1995) (citation omitted). It is the Commonwealth's burden to prove by a preponderance of the evidence that the evidence challenged by a defendant in his motion to suppress is admissible. *See Basking.* The suppression of evidence is a remedy available in instances where the infringement not only violates the Pennsylvania Rules of Criminal Procedure, but "also implicates fundamental, constitutional concerns, is conducted in bad-faith or has substantially prejudiced the defendant[.]" *Commonwealth v. Mason*, 507 Pa. 396, 407, 490 A.2d 421, 426 (1985).

Contrary to defendant's position, his federal and state constitutional rights were not violated as he was not entitled to the provision of Miranda warnings during either interview. In *Commonwealth v. Busch*, 713 A.2d 97, 100 (Pa. Super. 1998), the court held that "[i]t is well-settled that the police are only required to advise a person of his *Miranda* rights if that person is subjected to custodial interrogation." To " 'trigger the safeguards of *Miranda*, there must be both custody and interrogation.' " *Commonwealth v. Cruz*, 71 A.3d 998, 1003 (Pa. Super. 2013) (quoting *Commonwealth v. Heggins*, 809 A.2d 908, 914 (Pa. Super. 2002)). In *Commonwealth v. Baker*, 24 A.3d 1006, 1019 (Pa. Super. 2011), the court explained that "police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest." Police "[i]nterrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth v. Ingram*, 814 A.2d 264, 271 (Pa. Super. 2002).

In effect, "[t]he test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his

freedom of action or movement is restricted by such interrogation." *Commonwealth v. Chacko*, 500 Pa. 571, 577, 459 A.2d 311, 314 (1983). In making this determination, the court considers several factors before concluding that a defendant was subjected to custodial interrogation. In *Busch*, the court observed that:

> Among the factors the court utilizes in determining, under the totality of the circumstances, whether the detention became so coercive as to constitute the functional equivalent of a formal arrest are: the basis for the detention; the duration; the location; whether the suspect was transferred against his will, how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions.

*Id.*, 713 A.2d at 101 (quoting *Commonwealth v. Peters*, 642 A.2d 1126, 1130 (Pa. Super. 1994)).

In this case, the detectives were not required to provide defendant with *Miranda* warnings when they interviewed him on May 7, 2012 and on May 14, 2012. On neither occasion was defendant in custody as he was not restrained or kept against his will by police. Before the detectives conducted the first interview, defendant was transported to the hospital due to his medical condition. *See, e.g., Commonwealth v. Perry*, 710 A.2d 1183 (Pa. Super. 1998) (rejecting the defendant's argument that his immobilization in the hospital room during police questioning rendered him subject to custodial interrogation); *Commonwealth v. Ellis*, 549 A.2d 1323, 1333 (Pa. Super. 1988) (concluding that the defendant was not subjected to custodial interrogation because the restraints on his freedom "were those caused by his medical condition, as opposed to any action on the part of the police"). When the second interview occurred, defendant was inside his own home in the presence of a family member. *See, e.g., Commonwealth v. Mannion*, 725 A.2d 196 (Pa. Super. 1999) (concluding that the defendant was not subjected to custodial interrogation when police questioning occurred in her home because there was no evidence of intimidation or restriction of freedom by police).

Although the detectives informed defendant that he was being questioned about the murder of Ms. Raudenbush, defendant was free to stop the interviews whenever he wished to do so. Even if defendant was considered a suspect at the time, that fact alone was not enough to conclude that he was subjected to custodial interrogation. *See Commonwealth v. Page*, 965 A.2d 1212, 1218 (Pa. Super. 2009) (ruling that "[t]he fact that the police may have 'focused' on the individual being questioned or that the interviewer believes the interviewee is a suspect is irrelevant to the issue of custody"). In both instances, defendant's freedom of action or movement was not restricted as a result of police interrogation. As previously mentioned, the detectives did not place any restraints upon defendant. Rather, defendant's freedom of movement was limited solely by his physical disability; a factor beyond police control. *See, e.g., Commonwealth v. Johnson*, 556 Pa. 216, 239, 727 A.2d 1089, 1100 (1999) (determining that the defendant's "inability to leave [during police questioning] was not the result of any action of restraint by the police, but was due to his physical condition at the time"). There is also nothing in the record to suggest that the interviews were long in duration. Furthermore, the detectives did not threaten or use force on defendant. In fact, the detectives wore plainclothes and did not display their guns on either occasion. Neither did the detectives employ any illegal investigative methods.

During neither interview was defendant intimidated, coerced or deceived into making his statements. Rather, his decision was freely and deliberately made. When defendant made this choice, he was fully aware of the consequences of his decision. He was alert and comprehended the questions that he answered. After engaging the detectives throughout both interviews, defendant exercised his freedom to decline further participation in the interviews. After the first interview, defendant refused to sign the written statement. During the second informal

interview, defendant denied the detective's request to conduct a formal interview and to provide a written statement. In both instances, defendant's refusal evidenced his awareness that he was free to conclude each interview at any time. Although the detectives provided *Miranda* warnings to defendant before he gave his second statement, those warnings were gratuitous because defendant was not in custody. *See Ellis*, 549 A.2d at 1329 (holding that "*Miranda* warnings are only required prior to custodial interrogations"). In light of the above, it is clear that defendant was not entitled to *Miranda* warnings on either occasion. The evidence further supports the conclusion that defendant made these statements knowingly, intelligently, and voluntarily. Consequently, both of defendant's statements were admissible as they were not made in violation of any state or federal constitutional right.

Defendant also contends that this court erred in allowing Sara Ayyash and Angela Garland to testify about prior life experiences that Ms. Ayyash encountered such as losing her virginity, having difficulty with friendships, and being bullied in school. It is well settled that "[q]uestions concerning the admissibility of evidence lie within the sound discretion of the trial court, and [the appellate court] will not reverse the court's decision on such a question absent a clear abuse of discretion." *Commonwealth v. Chmiel*, 558 Pa. 478, 493, 738 A.2d 406, 414 (1999). An evidentiary ruling "will not be disturbed 'unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous.' " *Commonwealth v. Bozyk*, 987 A.2d 753, 756 (Pa. Super. 2009) (quoting *Commonwealth v. Einhorn*, 911 A.2d 960, 972 (Pa. Super. 2006)).

In *Commonwealth v. Roth*, 531 A.2d 1133, 1140 (Pa. Super. 1987), the court held that "[a] basic requisite for the admissibility of any evidence in a criminal case is that it be competent and relevant." *See also* Pa. R. Evid. 402 (stating that "[a]ll relevant evidence is admissible,

except as otherwise provided by law"). Relevant evidence "is that which tends to establish facts in issue or in some degree advances the inquiry and is therefore probative." *Commonwealth v. Impellizzerri*, 661 A.2d 422, 428 (Pa. Super. 1995). Surely, "[n]ot all relevant evidence is admissible, and a trial court may exercise its discretion to exclude relevant evidence that may confuse, mislead or prejudice the jury." *Commonwealth v. Byrd*, 598 A.2d 1011, 1014 (Pa. Super. 1991). In *Commonwealth v. Enders*, 595 A.2d 600 (Pa. Super. 1991), the court explained that "[a] piece of evidence is of essential evidentiary value if the need for it clearly outweighs the likelihood of it inflaming the minds and passions of the jurors." *Id.* at 604 (quoting *Commonwealth v. Conway*, 534 A.2d 541, 544 (Pa. Super. 1987)).

Here, the challenged testimony was relevant in showing Ms. Ayyash's state of mind. The introduction of this evidence was an attempt to aid the jury in making sense out of how Ms. Ayyash entered into such an inappropriate relationship and why she remained even after being mistreated by defendant. This evidence also provided potential reasons for the inconsistencies in Ms. Ayyash's statements to police. Those reasons included Ms. Ayyash being afraid to share details about the incident and desiring to protect defendant. Given her troubled history, the jury could reasonably infer how and why Ms. Ayyash easily succumbed to defendant's control and manipulation before, during, and immediately after the murder. Thus, there was no error in permitting this evidence due to its essential evidentiary value.

In his Preliminary Statement of Matters Complained of on Appeal, defendant asserts that this court erred in permitting Ms. Garland to testify regarding her attempts to seek law enforcement intervention, regarding defendant's statements and demeanor during phone conversations, and regarding Ms. Ayyash needing defendant's permission to leave his house to visit her sick brother. There was no error in admitting Ms. Garland's testimony concerning these

matters. Generally, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa. R. Evid. 404(b)(1). Nevertheless, such evidence "may be admitted for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa. R. Evid. 404(b)(2).

In *Commonwealth v. Passmore*, 857 A.2d 697, 711 (Pa. Super. 2004), the court held that "[e]vidence of prior bad acts is also admissible where the particular crime or act was part of a chain, sequence, or natural development of events forming the history of a case." This exception is "also known as the 'complete story' rationale, i.e., evidence of other criminal acts is admissible 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.' " *Commonwealth v. Lark*, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988) (quoting McCormick, Evidence §·190 (1972 2d ed.). Furthermore, Pennsylvania Rule of Evidence 404(b) "is not limited to evidence of crimes that have been proven beyond a reasonable doubt in court. It encompasses both prior crimes and prior wrongs and acts, the latter of which, by their nature, often lack 'definitive proof.' " *Commonwealth v. Lockuff*, 813 A.2d 857, 861 (Pa. Super. 2002) (emphasis omitted).

Here, the testimony of Ms. Garland concerning defendant's prior bad acts were admitted for reasons other than to show his action in conformity therewith. Ms. Garland's testimony was probative because it showed the nature of the relationship between defendant and her daughter, Ms. Ayyash. *See, e.g., Commonwealth v. Rogers*, 615 A.2d 55 (Pa. Super. 1992); *Commonwealth v. Ramos*, 532 A.2d 22 (Pa. Super. 1987), and *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985), *abrogated on other grounds by Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136 (2001) (affirming trial court's admission of evidence of other crimes or prior bad

acts to show relationship of parties). Similar to the evidence challenged above, this evidence provided the jury with a contextual background and corroborated other evidence that defendant acted in a controlling and manipulative manner toward Ms. Ayyash.[5] Contrary to defendant's argument, this evidence was not introduced for the inadmissible purpose of showing that defendant was a person of bad character or that he had criminal tendencies.

Although the contested evidence may have been disturbing, it was nonetheless relevant. *See Commonwealth v. Sasse*, 921 A.2d 1229, 1234 (Pa. Super. 2007) (explaining that "[e]vidence is relevant if it has any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence"). As the court held in *Commonwealth v. Dillon*, 592 Pa. 351, 367, 925 A.2d 131, 141 (2007), "[e]vidence will not be prohibited merely because it is harmful to the defendant." This court is not " 'required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand[.]' " *Id.* (quoting *Commonwealth v. Lark*, 518 Pa. 290, 310, 543 A.2d 491, 501 (1988)). Thus, there was no error in admitting this relevant evidence at trial.

---

[5] Before admitting this evidence, this court reasoned outside the presence of the jury:

> There are two things here. One, you have attempted to get into these e-mails because you contend the defendant was abusive toward the witness and that he was controlling, and I don't think anybody could read this and disagree. The defense has strenuously objected, and in the main I have ruled in their favor according – to benefit to the defendant.

> There is very much before this jury the question of why she, Ms. Ayyash, has either changed her story or been less than forthcoming, if they believe her at this juncture. And I think the Commonwealth should be allowed to demonstrate; A, there is corroboration for the victim's testimony which is conceivably evidence of controlling behavior by the defendant; and B, absent some idea from the mother about the controlling nature of the relationship, the 2013 revelation makes very little sense. So I'm inclined to let it in for those purposes. I am sympathetic to the defendant's position that if she is to testify in the fashion that you've suggested, that it be limited. I don't want her to go off and on and on about ugly things the defendant said to her, if we can convey the idea that he wanted to be – to separate her from her mother so that he could control her, that's admissible. It should be done with as little prejudice to the defendant as possible.

N.T. 05/14/14, pp. 106-107.

Indeed, before permitting the contested portions of testimony elicited from Ms. Ayyash and Ms. Garland, this court determined that the probative value outweighed any potential prejudice to defendant. *See Commonwealth v. Owens*, 929 A.2d 1187, 1191 (Pa. Super. 2007) (reiterating principle from *Commonwealth v. Broaster*, 863 A.2d 588, 592 (Pa. Super. 2004), that "[b]ecause all relevant Commonwealth evidence is meant to prejudice a defendant, ... exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case"). Moreover, any potential prejudice that may have inured to defendant was cured by a cautionary instruction to the jury.[6] *See Commonwealth v. King*, 959 A.2d 405, 417 (Pa. Super. 2008) (ruling that "where other crimes evidence is offered for a legitimate purpose, ... and a limiting instruction is provided, the prejudicial effect of the evidence generally yields to its probative value"); *Commonwealth v. Claypool*, 508 Pa. 198, 206, 495 A.2d 176, 179 (1985) (holding that "such evidence must be accompanied by a cautionary instruction which fully and carefully explains to the jury the limited purpose for which that evidence has been admitted"); *Commonwealth v Strickland*, 452 A.2d 844, 847 (Pa. Super. 1982) (concluding that a trial judge's cautionary instructions to the jury were sufficient to ensure a fair and impartial trial because of the well-settled principle that "juries can be trusted to follow the trial court's instructions"). In addition to this cautionary jury

---

[6] This court provided the following instruction to the jury:

> Ladies and gentlemen, you've now heard evidence from both Ms. Ayyash and Ms. Garland tending to show that the defendant was engaged in improper conduct for which he is not now on trial. I am speaking of the testimony of both women to the effect that the defendant had a sexual relationship with Ms. Ayyash before she turned 18. This evidence is before you for the purpose of tending to show the nature of the relationship between the parties, to wit, Ms. Ayyash and Mr. Chac.
>
> You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt in this case.

N.T. 05/14/14, pp. 122-123.

instruction, defendant had ample opportunity to counter the Commonwealth's theory regarding the relevance of this evidence. Thus, defendant's argument has no merit.

Even if this contested evidence was erroneously admitted, its admission was harmless error as it was not the sole contributing factor to the jury's verdict. Harmless error is shown when "(1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Laich*, 566 Pa. 19, 29, 777 A.2d 1057, 1062-1063 (2001). As the court held in *Commonwealth v. Passmore*, 857 A.2d 697 (Pa. Super. 2004), " '[t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial.' " *Id.* at 711 (quoting *Commonwealth v. Drummond*, 775 A.2d 849, 853 (Pa. Super. 2001)).

In this case, the evidence of guilt was so overwhelming that the alleged error could not have contributed to the verdict. *See Laich*, 566 Pa. at 29, 777 A.2d at 1062 (ruling that "an error is harmless only if [the appellate court is] convinced beyond a reasonable doubt that there is no reasonable probability that the error could have contributed to the verdict"). Although the challenged portions of Ms. Ayyash's testimony and Ms. Garland's testimony were helpful to the Commonwealth, it was not the only evidence presented against defendant. As the above discussion established, the challenged portions of testimony were merely corroborative of other evidence the Commonwealth introduced to prove defendant's guilt beyond a reasonable doubt. Thus, defendant is not entitled to relief.

Accordingly, in light of the foregoing, the judgment of sentence should be AFFIRMED.

BY THE COURT,

Sandy L. V. Byrd,    J.